Good afternoon. Illinois Appellate Court's First District Court is now in session. The First Division, the Honorable Justice Hyman presiding. Case number 1-8-1-0-1-7, Peoples v. Pagnuson. Good afternoon. Welcome. Will the attorneys, please, and the appellant first and the appellee, introduce yourselves and approximately how much time you would like to have. Benjamin Wimmer for the appellant with the State Appellate Defender's Office, about 10 minutes should be fine. Good afternoon, your honors. Assistant State's Attorney Summer Mogames for the appellee and approximately 15 minutes. Mr. Wimmer, do you want to rebuttal time? Five minutes if we could. Oh, sure. No problem. So what we have been doing is interrupting. We found that if we wave our hands, sometimes counsel don't see it. They're so involved in their arguments. So if you hear us, then we would appreciate if you would finish your thought and then stop. And then we'll ask our questions. Any This court should reverse the dismissal of Mr. Pegsycian's post-conviction petition because it substantially states a claim that his guilty plea, negotiated guilty plea, to the murder of Ricky Russo and the attempt murder of Johnny Vaughn is caused by ineffective assistance of counsel. Specifically, Pegsycian claims that although his trial attorney knew that he was not a citizen of the United States, he nonetheless failed to inform him that a conviction of murder would render him subject to mandatory removal from the United States and categorically ineligible for any discretionary relief from removal. Now on appeal, the state does not dispute that the petition substantially states that counsel did not so inform Mr. Pegsycian and that counsel's performance was unreasonable. Rather, the state disputes whether the petition substantially states that Pegsycian was prejudiced by counsel's performance so as to warrant an evidentiary hearing on his claims. First, it's important to establish the legal standard for showing prejudice in an ineffective assistance of counsel claim such as Mr. Pegsycian's. That's set forth by the Illinois Supreme Court in People v. Brown in 2017. Under that case, not only must a defendant allege that he would not have taken the guilty plea and would have gone to trial had he received proper advice from counsel, but a defendant must also show, quote, that a decision to reject the plea would have been rational under the circumstances that the defendant faced, unquote. Now in its brief, the state cites a number of cases going back to People v. Hall from the Illinois Supreme Court in 2005 for the proposition that in order to show prejudice in an ineffective assistance of counsel claim involving a guilty plea, a defendant must either make a claim of actual innocence or articulate a plausible defense to the charges. However, as the Illinois Supreme Court made clear in Brown from 2017, that standard applies but only where a defendant alleges that counsel was ineffective in misadvising him as to his chances of success at trial. If counsel misadvises you as to your chances of success at trial, but it turns out that you don't have any reasonable chance of success anyway, a defendant facing those circumstances, a rational defendant, would still Lee v. United States come into play here? Well, Lee v. United States is very similar to People v. Brown in the state of Illinois in that it establishes that where a defendant claims ineffective assistance of counsel in the form of his attorney failing to inform him of the significant collateral consequences of a plea, there's not necessarily a need to show, to articulate a plausible defense to the charges in order for a decision to reject that plea to be rational. I mean, specifically in Lee v. United States, the U.S. Supreme Court held that it would be rational for a person to reject the particular plea that was offered and accepted by the defendant in that case, despite the fact that it was undisputed there that the defendant had no plausible defense to the drug charges against him. So, ultimately, under Brown and under Lee v. United States, Mr. Pixician's petition substantially states that he was prejudiced. If it states that he would have rejected the plea had counsel advised him, you know, correctly as to the deportation consequences, and if it establishes circumstances such that a rational, it would have been rational for a defendant in those circumstances to reject the plea. Now, as to the first part, it does substantially state that Mr. Pixician would have rejected the plea and gone to trial had counsel informed him that a murder conviction would subject him to mandatory removal. That goes directly to the issue of prejudice, and I want you to help us a little bit with this, because it's clear from the record that the defendant was aware that he was already under a deportation order. Now, I realize that he had not been deported, and there had been several years since that order was entered, and the immigration judge made it clear that his order had no effect, that it was not self-executing, but if he already knew he was under a deportation order for these, what I would consider lesser charges, then it seems as though he knew that he would be deported if he were to plead guilty to this first-degree murder charge and attempt first-degree murder, so where's the prejudice there if he already knew, one, that he was under a deportation order, and chances are that pleading guilty to these greater charges would cause deportation, would surely cause deportation. Well, there's two parts to your question, Your Honor. The first is whether, in fact, Pixisian was under the effect of a deportation order in 2013 that could be executed, I guess, at any time. There is a bit of a lacuna in the record in that it's not clear precisely what happened after the deportation order was executed, but there is a reasonable conclusion that the deportation order, that he had gotten some sort of discretionary relief from deportation that was beyond the purview of the immigration judge and the Bureau of Immigration Appeals, the Board of Immigration Appeals, excuse me. He stated, Mr. Pixisian in his affidavit, that he was on immigration supervision for basically a decade after receiving employment authorization for the United States, and that he was no longer on supervision as of 2007. In those circumstances, I mean, it's certainly reasonable for Mr. Pixisian to conclude that he is no longer subject to immediate deportation just at, you know, the will of the Attorney General, and there's, you know, it's a reasonable conclusion that he was not subject to deportation at the will of the Attorney General at that point. Moving on to the second part of your question, given the fact that Mr. Pixisian had had contact with, you know, the Immigrations and Customs Enforcement before, based in part on prior convictions of possession of a stolen motor vehicle, would he, you know, know in the present case that a conviction of murder would subject him to mandatory deportation? The answer to that is, at this stage, you know, because he, you know, affirms that he did not know that. Until you get to an evidentiary hearing, the issue is whether or not there is anything in the record that flat out, you know, contradicts the statement in his affidavit, and there's not. First of all, there's a couple of parts to this. First of all, previously, he was ordered deported in part based on convictions of two crimes of moral turpitude back in the late 1980s. First of all, in this case, there's only one conviction, so you wouldn't necessarily, you know, know that a single conviction would result in deportation in this case. Additionally, the category of crimes for moral turpitude, of crimes of moral turpitude, is different than the aggravated felony classification in this case in two ways. First of all, you aren't categorically ineligible for discretionary relief from removal on the basis of convictions of crimes of moral turpitude. You are eligible for, ineligible for discretionary relief in a case like this based on a conviction of an aggravated felony. Secondly, even then, the crimes of moral turpitude category is unlike the aggravated felony category. It doesn't specifically indicate, you know, which crimes are within it. By contrast, the aggravated felony category specifically lists, you know, murder as the first, you know, of the aggravated felonies. If you're a lawyer, you could probably guess that there might be some sort of immigration consequences, but of course, Mr. Pixicine was not a lawyer. He needed effective assistance of counsel, which in this case would involve pointing out to him, you know, the obvious and mandatory consequences under the Immigration and Naturalization Act. While the state can still, you know, potentially dispute this as an evidentiary hearing, once more evidence is introduced and the trial court can make credibility determinations, for purposes of the appeal from the dismissal, the petition does substantially state that he did not know that the, you know, murder conviction would subject him to mandatory removal from the United States. So that's the first part of the prejudice standard. And the second part is whether a reasonable person in dependent circumstances could rationally choose to reject the plea. And, you know, the most important circumstance here is the fact that basically, in fact, though not in law, the Philippines are a foreign country to Mr. Pixicine. According to the record, he first came to the United States when he was seven years old. He had a question on that. What significance of any is there to the lack of a birth certificate having been found in the Philippines? Legally speaking, I don't think it should matter that much. I mean, I haven't researched like 37 constitution. It passed through the father's side. His father actually did show up at one of the deportation hearings before the immigration judge back in 88. It's in one of the exhibits attached to the petition. His name is Andres Pixicine, as opposed to Andre. The last name is Tagalog. Presumably he's a Philippine citizen. If he is, Mr. Pixicine should be a Philippine citizen regardless of where he's born. In addition to that, he entered the country on a passport. At one of those hearings as well, his passport was actually submitted into the record before the immigration judge. They don't specifically say it was a Philippine passport. So, you know, I assume it would have been one. I mean, ultimately it's up to a foreign government, whether a foreign government decides to admit anybody to their country. But based on the record here, there's not any really serious argument that Mr. Pixicine isn't a citizen, at least so long as you conclude that he's the same person now that entered the country back in the 1970s. But given the fact that we're talking about deporting him to, you know, what essentially is a foreign country to him, a reasonable person faced with, you know, that consequence could rationally choose to reject this plea agreement. Now, that effectively, as the state notes, would give him a very good chance of being sentenced to a de facto term of life in prison. And that's not a small thing. I mean, to be able to control the circumstances with which, you know, one confronts one's own mortality is important. I mean, that's what, you know, the most traumatic experience all of us will eventually endure. But, you know, the degree of control that one can exercise while in prison and, you know, the effective degree of control and dignity you can muster after being, you know, deported to a foreign country in your old age, you know, it's a question about which rational minds could differ. And the state says that if he went to the Philippines, life would be difficult. Yes. I mean, I can't prove, you know, the specific circumstances that he would face. I mean, obviously, the main consideration, I guess, is that he has no connections there. At this point, you know, his parents, if I remember correctly from the record, they're both dead. Can't reach out to them for any further contacts in the old country. After, you know, a stretch in prison for murder, he's not necessarily going to have any resources, at least there's no affirmative indication of any on the record. I mean, I presume he speaks Tagalog, if he can remember that from age seven. And at any rate, one of the official languages of the government in the Philippines is English. So he wouldn't be completely lost. But he would be, you know, forced to, forced into a situation where he'd have to support himself in circumstances and at an age where it'd be, you know, difficult to do so from scratch. And here he has a wife, child or children, children. Yeah, they can come visit him. At least he has connections here in the United States, which would disappear where he eventually deported. Yeah, unless they all agreed to travel to the Philippines as well. I mean, under these circumstances, a reasonable person could go both ways about whether or not to accept the plea agreement. But because of the ineffective assistance of counsel, at least so far as the petition alleges, Mr. Pixiesian didn't get the right to actually make that voluntary choice initially. In order to determine whether or not those allegations are true, this court should reverse the dismissal of the petition and remand for an evidentiary hearing. Any further questions? Okay. Thank you, your honors. May it please the court. We are asking for affirmance because a substantial showing was not met. It is our position that petitioner has not shown prejudice throughout this case. This petitioner has not shown that a life in prison versus a life of freedom in a different country is similarly dire. Why do you believe that? Your honor, so the court informed petitioner that he could receive up to 60 years in the Illinois Department of Corrections for the first degree murder and then a 30-year sentence for the attempt first degree murder. So that's, he could have faced up to 90 years in prison. A petitioner did plead guilty to Council 127 of the 52 charges he was charged with, and he was sentenced to 38 years for the first degree murder and 10 years for the attempt first murder to run concurrently. So instead of the effective life in prison that he could have faced, petitioner took an offer that allows him to live a life of freedom in the Philippines at the age of about 62. How can you say that? I don't understand how that follows because his allegation is, and I believe you agree, am I not right, that plea counsel had a duty to inform the defendant of the immigration consequences of the plea, and he says he wasn't informed. So I don't understand that argument at all. Yes, your honor. So it is, it's our position that counsel was not deficient, but we do acknowledge that it wasn't indicated in the record what exactly transpired between the petitioner and counsel. However, just because the record doesn't indicate that, it doesn't mean that the counsel was ineffective or deficient because petitioner... Well, isn't that why we're going to have a hearing, a third stage hearing? I'm sorry, what was that? Isn't that why we should reverse so we can have a hearing and determine what would happen? Oh, well, no, your honor, because although it doesn't indicate in the record whether there was a communication between counsel and petitioner, petitioner also knew of his citizenship status. This was not something new to him or he was made aware of for the first time, because he did have that deportation hearing back in 1988 to 89. I think the issue is he knew his immigration status, but he didn't know, he says, that if he got convicted of murder, he would be mandatorily deported at the completion of the sentence. That's what he's saying he didn't know. I know I'm an immigrant, but I didn't know being an immigrant with the murder conviction gets me back to the Philippines. So did the lawyer have an obligation, knowing that he was an immigrant, to tell him, look, you can get these 38 years or 35, but at the end of it, you might be deported or you will be deported. I mean, that's the question. Did he have an obligation to tell his client that? Your Honor, we do acknowledge that there is an obligation to tell your client of the consequences. However, that wasn't in the record. It didn't indicate whether that communication took place. A petitioner did say that he wasn't informed. However, towards his state of mind, he knew that being convicted of a crime would result in a deportation because he did have that. How do we know that? Yeah, that was my question too. Yeah. I mean, how do you know? Yes, Your Honor, it's because back in his deportation hearing from 1988 to 89, he was told that because of his two crimes that he was going to be deported. And it's unknown why he wasn't actually deported or why that process wasn't complete. However, he did. It goes to his state of mind that if you commit a crime, there's a difference. You said he was told he'd be deported. I don't think that's accurate. He was deportable. Would you agree to that? He was deportable. He wasn't told he was going to be deported. In fact, he wasn't deported. We know that. In 1988 through 2013 and after is a long time. So he was deportable. We can all agree to that. But you said he knew he'd be deported. Isn't there a difference? Yes, Your Honor. He was deportable and he was told that because of the crimes that he committed back in that hearing, he would be deplorable because of those crimes. So that goes towards his state of mind that if you commit a crime, there is a chance that you are deplorable. So if he knew that back in 1988, then in 2013, he may have thought the same thing. If counsel never told him this is mandatory. That's the difference. Deportable means you may or may not. Mandatory means you are. You will. No questions asked. That's what this case is all about. That is the significant difference in this case, isn't it? Yes, Your Honor. And so going to Lee, Lee kind of narrows the prejudice and that prejudice was shown by Petitioner. Lee states that when consequences are similarly dire to a defendant, even the smallest chance of success at trial may look attractive. But there are two things wrong with that argument. There is no small chance here. Petitioner called it in their brief, a long shot chance of winning. And second, all that's left is life and death in prison or going to the Philippines and living his life of freedom. But that's his choice. I mean, you're saying he doesn't get to make that choice because his attorney never told him. That's his allegation. He never knew. So if he never knew, he couldn't make that choice. He should be allowed. That's what this is all about. Shouldn't he be allowed to make that choice that he will be sent to the Philippines at the end of a sentence or spend the rest of his life in the United States and die here in prison? But why can't the man make that choice? Your Honor, he could make that choice. However, at the time of when he pled guilty, he knew that committing a crime makes him a deplorable, makes him deplorable. I'm sorry. So at the time that he pled guilty back to that deportation hearing he had in the late 80s to 89, he knew that committing a crime would cause a consequence of being deplorable. But that's a difference than being mandatory. I mean, again, you can't equate the two concepts. They're not the same. You would agree they're not the same. Correct, Your Honor. Okay. So Lee does narrow the prejudice that must be shown. And before Lee, the per se rule explained that a defendant with no viable defense could not show prejudice from the denial of his rights to trial. But Lee narrows that prejudice and that the defendant must show from his perspective the consequences of the conviction after trial and the plea deal he bargained for are similarly dire. And unlike Lee, this isn't an 18-year sentence versus a 20-year sentence in prison. This is a life of freedom at the age of 62 versus the effective life and sentence that he was faced with. And he could have gone to trial, and as petitioners stated, there was a long shot chance of winning. But had he gone to trial, whatever term he would have ended up with, there is a chance of deportation after that term. There's an opportunity he may not have been found guilty. He has an alibi. The record indicates he has an alibi. He has an affidavit about that alibi. So to say it's a long shot, maybe they say that, but he had an alibi. So we don't know that. I mean, you seem to be assuming we know what's in his mind, but that's the question that has to be determined by a hearing, isn't it? Well, Your Honor, so petitioner they didn't assert a claim of actual innocence or they didn't dispute the facts that were stipulated to. A petitioner only asserted that he didn't like the outcome of both situations rather than actual innocence. So the situation here is not similarly dire as Lee explained. So petitioner cannot show prejudice under Lee. Additionally, substantial showing was not met because petitioner didn't meet the second prong of Strickland. Even if this court... Let me go back to Lee a second. But in Lee, the court said that we weigh the consequences of a guilty plea versus a trial from the defendant's perspective. You agree with that? Yes, Your Honor. Okay. So if we're doing it from the defendant's perspective and he doesn't know the difference between what might happen if he pleads guilty versus trial and then maybe spending the rest of his life in jail, then I don't see how that your argument says it wasn't... We don't meet the standard in Lee. The defendant doesn't meet the standard in Lee. Your Honor, in Lee, the sentence there was an 18-year sentence versus a 20-year sentence. And here it was a 38-year and 10-year sentence to run concurrently versus the 90 years he could have faced. So there is a difference between the two cases. Okay. So there's always a difference between cases. Rarely are all cases, every fact the same, but that doesn't... The court did not mention, did it? Anything about the years being something that's important to the Supreme Court in Lee? I'm not sure, Your Honor. I don't recall that. That doesn't seem like an important factor, does it? I'm not sure, Your Honor. Lee does define that it must be similarly dire. And in that case, Lee faced an 18-year sentence versus a 20-year sentence, which in this... And in this case, the petitioner faced the 38 and 10-year sentence to run concurrently versus the 90 years that he could have faced by going to trial. Okay. So they're both the same, aren't they? Right? Is he going to live to be 118 or something like that? I mean, 90 years... What do you mean? You're not sure he'll live to be 118? I mean... There's no chance, right? So what I'm saying is 90 years or 35 years, considering his age, are similar, aren't they? They're both basically pretty much like he has a chance of maybe getting out a little early if he takes the plea in a sentence. We don't know what the sentence might be down the road then. So again, he has an opportunity. He may still have time. Your Honor, he may have the opportunity, but even if he were to go to trial, whatever that sentence may be by the judge, he would still be deplorable after that or mandatory... There would be a mandatory deportation after that trial. So regardless of whether he took this plea or went to trial, the deportation would still stand. Even if this court finds that counsel's conduct fell below an objective standard of competence, the second prong of Strickland was not met by petitioner. In order to meet a second prong of Strickland, the petitioner must show that there is a reasonable probability that but for counsel's incompetence, the outcome of the proceeding would have been different. Now, the prosecution only moved forward on counts one and 27 of the 52 charges that he was charged with, and he faced a much more severe punishment of an effective life in prison instead of the 38 and 10-year concurrent term that he bargained for. Therefore, the consequences of proceeding to trial was much higher than pleading guilty. Additionally, even if petitioner would have gone to trial, this would not have spared petitioner from being deported if he were found guilty. And again, petitioner did... They did admit that beating the charges at trial would have been a long shot. Petitioner has benefited from his plea because after his sentence, he is able to live a life of freedom at the start of his 60s instead of living the remainder of his life in prison. For these reasons and those in our brief... Okay, but you're making that choice. You say that it's better to live in freedom in the Philippines, knowing no one and being destitute at your old age. That's what you're saying. You're making that choice. Your Honor, petitioner... Your Honor, petitioner kept mentioning that a rational person would have chosen to go to trial. However, a rational person would not have chosen to subject themselves to a 90-year prison term if they were being offered the 38 and 10-year concurrent sentence. A rational person would have chosen the plea deal because it's not 90 years, it's not an effective life in prison. And it's a chance to start your life of freedom even though it is... Excuse me, it is in the Philippines. Well, you're assuming that after... If he didn't take the plea, he'd get more than 38 years, right? Your Honor, he was charged with 52 charges in each of those charges. We know they merge and everything else. I mean, your argument is premised on if he had gone to trial and had been convicted of murder and whatever, he would have gotten more than 38 years, right? It's not certain what he would have gotten. However, the petitioner did... Therefore, he took the 38 years so he could live in freedom in the Philippines or in Berlin, right? But we don't know what would have happened after trial. We don't know whether he would have gotten 25 years or 70 years. We don't know that. So we can't do that. It seems to me, and I think you would agree, that a lot of this depends on the credibility of the support he can come up with at trial, which the third stage would afford a trial court to evaluate. Whether this is all true or not, right? Your Honor, I do agree that no one knows what would happen if he did go to trial. We don't know what the sentence would be had he gone through with the trial. However, both sides do agree that going to trial would have been very difficult to do. In our brief, we do say that it would have been difficult for him to succeed at trial. So he did face a much more severe punishment had he gone to trial. And again, we're not sure what that outcome would have been. But given the charges, the 52 charges, it is more of a severe punishment than the two that prosecution moved forward with. But he might have gotten 38 years with 10 anyway after trial. He might have, probably not, but he could have. Yes, Your Honor, he could have. However, given the charges and what the parties stipulated to, it would have been very difficult to succeed at trial. But you are correct in that we don't know what the outcome of that trial would have been. It's just that both sides did admit that it would have been very difficult to win at trial. You just said very difficult. I don't know if they the word very, difficult. But being difficult, every case is difficult. You don't agree when you go to trial in a latent building. Anyone who goes to trial in a latent building, that's why a lot of people take pleas. Even innocent people are known to take pleas in Cook County because it's difficult to go to trial. To me, that's just an admission of the way things are in our legal system. Nothing more, nothing less. For them to say it was easy, of course, then I think they lose credibility. I think by saying it's difficult, they are admitting realities of our trial system. Yes, Your Honor. So in this case, a petitioner stipulated to the facts and what happened with the first degree murder and the attempt first degree murder. He doesn't claim actual innocence. He doesn't dispute anything that was stipulated to. So this isn't a case of whether he was innocent and he pled guilty. This is a case that he did do something. He agreed, stipulated to the facts of what he did, and he took a bargain that was much less than what he could have faced at trial. Thank you very much. For those reasons and the reasons in our brief, we ask that you affirm the court's ruling. So the real question here that you're kind of leaving us with is the second prong of strickling. And the question is, but for counsel's deficiency, is there a reasonable probability that the outcome would have been different? And you're arguing that there would have been no difference. But the question is, but for counsel's deficiency, whether or not he would have, number one, taken the plea. And then the other part of that is whether or not he could have prevailed at trial. And you're arguing as to each of those two issues, what? As for the first issue, but for counsel's deficiency, correct, there's no difference in him pleading guilty and taking the 38-year sentence or going to trial, getting whatever sentence the judge would have sentenced, and then being deported afterwards. And I'm sorry, could you repeat the second one? Well, that's the first part. And then the second part is whether or not he could have prevailed at trial, because had he not taken the plea, he would have gone to trial. And had he prevailed at trial, clearly the outcome would have been different. Correct, your judge. However, here, he would have had a difficult time succeeding at trial. And both sides do agree that he would have had, petitioner said that he had a long-shot chance of winning at trial. He doesn't make a claim of innocence. He doesn't make a claim that anything different than what he stipulated to happened. He just says that it would have been a long-shot chance. And we do agree because of the facts that were stipulated to at his trial. Thank you. Thank you. Mr. Whitmer. Briefly, in response to this, the most recent discussion just now about what the likelihood of success at trial in the event he went to trial, logically, that is not the prejudice inquiry in an ineffective assistance of counsel claim, where the claim is that a guilty plea was caused by the ineffective assistance of counsel. As the court, US Supreme Court, reiterated in Lee versus United States, you can't rely on the presumption that a trial produced a correct result if there was no trial in the first place. The question for whether the outcome of the proceeding would have been different is whether the defendant would have still pleaded guilty if he had received effective assistance of counsel. And the standard for showing that, set forth by the only Supreme Court in Brown, is whether or not the defendant claims he would have, and whether or not that would have been a rational choice under the circumstances. Secondly, at one point during the state's presentation just now, my opposing counsel was saying a rational person would not have chosen to go to trial. A rational person would have done the opposite. I think it's important to point out that under Lee and Brown, there's not a presumption that a rational, there's always one choice in a situation, which is the rational choice, and that nobody could do anything different. The way the Brown court put it was, a decision to reject the plea would have been rational. That doesn't necessarily mean that a rational person couldn't also choose to accept the plea. The issue is whether or not, when the whether that would have been a crazy thing not to do. In this case, given the, you know, allegations of the petition, can't conclude, you know, without an evidentiary hearing, that it would have been crazy to reject this plea. For that reason, I would urge this court to reverse the dismissal of Mr. Pezzicino's petition and remand for an evidentiary hearing. Mr. Wimmer, when is he scheduled to be released from the IDOC? 2008. I'm sorry, I don't have the specific date of the year, but it's going to be in 2008. Eighth? Yes. Oh, I'm sorry, 2028. 2028. So in a 38-year sentence, he went into custody, what, 2010 or 2008? Around there. He did just get in ahead of truth in sentencing. So he's doing 50%? I believe so, yes. Okay, so he probably got in in 60, he probably got arrested in 10. So he's going to get out at 2016, he'll be how old, approximately? It's age 62 in 2028. Okay, thank you. When you're figuring that out, are you figuring it out at the full amount, or are you figuring it out at 50-50? Day for day. I'm actually looking at his outdate on the IDOC website. Right. But they don't have to give them the day for day, so we don't know what might happen, do we? True, it's possible they could revoke a good contract. So why would we want to consider the day for day when we don't know? Shouldn't we take the full sentence? I suppose there's an argument to be made that you could. In People v. Brown, it was noted that a lot of people wouldn't be assuming that they would necessarily get a full good conduct credit. So yeah, that is a fair argument. Well, the reason I bring it up is that typically, when you're talking to a client about whether the plea is a good deal or not, whether you should take it or not, you say it's 20 years, but you'll be out in 10, assuming that you don't blow up in jail, right? So I mean, it's another consideration that typically lawyers talk about with their clients about, yeah, it's this amount of years on its face, but with good day for day credit or 85%, you're going to get out at projected date of so-and-so, right? I mean, yes. There's no sort of artificial limitations that Brown puts forward on the circumstances that are facing a defendant and how they would affect a rational decision. As the Illinois Supreme Court said in Brown, it's not necessarily going to be as important a consideration as other considerations, depending upon the case, but it's certainly something that a defendant could consider and consequently that a court can consider when determining whether a decision to reject a plea would be rational under the circumstances. I must remember, it's correct that he was born in 67, correct? Is that- I've got 66 right here. Let me check the, yeah, Mr. Pixician affirms that to the best of his knowledge, he was born in 66. Do you have a question? No. Okay. Thank you very much to both of you. Your briefs were excellent. Your arguments were excellent. We appreciate your preparedness. We'll take the case under advisement and we'll be ruling shortly.